IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:14-cv-24096-KMM

MARC CRADDOCK,

    Plaintiff,

v.

M/Y THE GOLDEN RULE, her engines,
tackle, equipment, electronics, rigging,
dinghies, furniture, appurtenances, etc.,

    Defendant.
    _____/

## ORDER GRANTING PLAINTIFF'S
## EMERGENCY MOTION FOR RECONSIDERATION

THIS CAUSE is before the Court upon Plaintiff Marc Craddock's Emergency Motion for Reconsideration (the "Emergency Motion for Reconsideration") (ECF No. 10). Craddock asks this Court to reconsider its November 4, 2014, Paperless Order (ECF No. 6) denying his emergency motions for an arrest warrant against Defendant M/Y THE GOLDEN RULE and for the appointment of a substitute custodian over the vessel. After careful consideration, and for the reasons set forth below, the Emergency Motion for Reconsideration is GRANTED.

**I.    BACKGROUND**

This is an in rem action to enforce a preferred maritime lien against Defendant M/Y THE GOLDEN RULE ("THE GOLDEN RULE"), a 2014 43' Midnight Express motor yacht bearing identification number EXK43010J415, arising out of out an accident between the vessel and a recreational swimmer on the navigable waters of the United States. Am. Compl. ¶ 1 (ECF No. 9).

1

On October 17, 2014, Plaintiff Marc Craddock was snorkeling with friends in the Atlantic Ocean off the coast of Miami-Dade County, Florida. Id. ¶¶ 2–4. Craddock was within 300 feet of the divers-down flag at all times.[1] Id. ¶¶ 5–6. While Craddock was snorkeling, Adam Gordon was on his way back from the Bahamas on THE GOLDEN RULE. Id. ¶ 2. The title owner of THE GOLDEN RULE is FLC Marine, LLC, a Florida limited liability company, of which Gordon is a managing member. Id. ¶ 7.

Early that afternoon, at approximately 1:39 p.m., THE GOLDEN RULE struck and ran over the snorkeling Craddock. Id. ¶ 11; Pet. Writ of Mandamus, In re Marc Craddock, No. 15-10462-E, at *2 (11th Cir. Mar. 25, 2015). Gordon told investigators from the Florida Fish & Wildlife Conservation Commission ("FWC") that he saw the dive flag before the incident. Pet. Writ of Mandamus at 2. Nevertheless, at the moment of impact, THE GOLDEN RULE was traveling at over 60 miles an hour and within 300 feet of the dive flag. Am. Compl. ¶ 11. FWC cited Gordon under Florida Statutes § 327.33(2) for the careless operation of a vessel, indicating the "operator's inattention" as the cause of the accident. Pet. Writ of Mandamus at 3.

As a result of the incident, Craddock suffered severe and permanent injuries, including a severed left arm, fractured pelvis, and perforated bladder. Am. Compl. ¶ 12. He has undergone multiple surgeries since, with medical bills totaling more than $300,000 to date. Pet. Writ of Mandamus 3. Doctors expect Craddock to undergo additional surgeries in the future. Am. Compl. ¶ 12.

---

[1] Florida Statutes § 327.331(5) provides that "[d]ivers must make reasonable efforts to stay within 300 feet of a divers-down flag or buoy on all waters other than rivers, inlets, and navigation channels. A person operating a vessel on waters other than a river, inlet, or navigation channel must make a reasonable effort to maintain a distance of at least 300 feet from any divers-down flag or buoy."

Craddock seeks sale of THE GOLDEN RULE.  While the vessel is worth an estimated $725,000, it is insured for only $200,000.  Decl. Randy Sweers ¶ 7, Pet. Writ of Mandamus Ex. 6.  It is also believed that the vessel is FLC Marine, LLC's only asset.  Pet. Writ of Mandamus 6.  Craddock claims that sale of THE GOLDEN RULE is the only way he will obtain just compensation for his injuries.[2]  Id.

To that end, on November 3, 2014, Craddock commenced this action against THE GOLDEN RULE upon the filing of a Verified Complaint In Rem.  The one-count Complaint asserts a claim against THE GOLDEN RULE for damages sustained as a result of the negligent operation of the vessel.  Am. Compl. ¶¶ 14–17.  Together with the Complaint, Craddock filed an Emergency Motion for the Issuance of Warrant of Arrest In Rem (ECF No. 3, 5), asking this Court to order the seizure of THE GOLDEN RULE, as well as an Emergency Motion for Appointment of Substitute Custodian and to Authorize Movement of the Vessel (ECF No. 4), asking this Court to appoint a substitute custodian over the vessel and authorize its transfer to the substitute custodian's secured facility.  The Court denied these motions.

Craddock then filed his Emergency Motion for Reconsideration.  A few months later, Craddock followed up by filing a Petition for Writ of Mandamus with the United States Court of Appeals for the Eleventh Circuit, seeking an order compelling this Court to issue an arrest warrant against THE GOLDEN RULE.  (ECF No. 27.)  This Court responded by asking the appeals court to remand the matter for an opportunity to rule on the Emergency Motion for Reconsideration.  (ECF No. 28).  The Eleventh Circuit granted the request.  (ECF No. 31).  The Court now takes up Craddock's Emergency Motion for Reconsideration.

---

[2] At last check the vessel was for sale within this judicial district.  Pet. Writ of Mandamus 5; see also Decl. Randy Sweers ¶ 9, Pet. Writ of Mandamus Ex. 6.

**II.      LEGAL STANDARD**

The "purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Burger King Corp. v. Ashland Equities, Inc., 181 F. Supp. 2d 1366, 1369–70 (S.D. Fla. 2002) (quoting Z.K. Marine Inc. v. M/V Archigetis, 808 F.Supp. 1561, 1563 (S.D. Fla. 1992)).  In particular, there are three major grounds which justify reconsideration: (1) an intervening change in controlling law, (2) the availability of new evidence, and (3) the need to correct clear error or prevent manifest injustice.  Id. (citations omitted); see also Arthur v. King, 500 F.3d 1335, 1343 (11th Cir. 2007).  To reconsider an order or judgment, there must be a reason why the court should reconsider its prior decision, and the moving party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision.  The decision whether to grant or deny a motion to reconsider is within the court's discretion.  See Am. Home Assurance Co. v. Glenn Estess & Assoc., 763 F.2d 1237, 1238–39 (11th Cir. 1985).

Craddock seeks reconsideration of this Court's November 4, 2014, Paperless Order denying his request for seizure of THE GOLDEN RULE, appointment of a substitute custodian, and authorization to move the vessel to the substitute custodian's facility.  The Court denied Craddock's motions on the grounds that he did not "adequately allege the existence of a judgment lien he could enforce against THE GOLDEN RULE."  (ECF No. 6).  This Court rejected Craddock's contention that he has a preferred maritime lien on THE GOLDEN RULE because his injuries arose out of a maritime tort (i.e., the alleged negligent operation of the vessel), concluding that "Plaintiff must first have an existing judgment lien for damages arising out of a maritime tort before he may assert an in rem action over THE GOLDEN RULE."  Id.

Upon further review, and in the interest of justice, the Court will reconsider Craddock's Emergency Motion for Issuance of Warrant of Arrest In Rem (ECF Nos. 3, 5) and Emergency

4

Motion for Appointment of Substitute Custodian and to Authorize Movement of the Vessel (ECF No. 4).

## III.   DISCUSSION

The main issue presented is whether this case comes within the Court's admiralty jurisdiction. This question has important consequences for the litigants. Only if the Court has admiralty jurisdiction may Craddock's negligence claim form the basis of a maritime lien, a special security interest recognized only in admiralty, which permits seizure of maritime property without a hearing and before judgment by ex parte order of the court. Seizure of THE GOLDEN RULE is precisely what Craddock seeks.

### A.   Legal Framework

"A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim," and it attaches the moment the claim arises.[3] Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864, 868 (11th Cir. 2010) (citations omitted). Maritime liens differ from other common law liens in that a maritime lien is "not simply a security device to be foreclosed if the owner defaults"; rather, a maritime lien converts the vessel itself into the obligor and allows an injured party to proceed directly against it through an in rem proceeding.[4] Id.

---

[3] "[A] ship's characterization as a 'vessel' is a mandatory prerequisite to the attachment of a maritime lien. Because a district court's authority to arrest a ship and to adjudicate an in rem proceeding against it requires the attachment of a maritime lien, both the lien and the district court's jurisdiction depend on a ship's status as a 'vessel.'" Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864, 872 (11th Cir. 2010). Here, the parties do not dispute that THE GOLDEN RULE is a vessel for purposes of this action.

[4] "An in rem action, in the strict sense of the term, is a proceeding to determine the right to specific property, against all the world. The action is equally binding on everyone and takes no cognizance of the owner or person with a beneficial interest. Of necessity, the action is against the thing or property itself directly, and consequently the property is the named defendant." David J. Oliveiri, Constitutionality of Provision in Rule C, Supplemental Rules for Certain Admiralty and Maritime Claims, Allowing In Rem Seizure of Property, 64 A.L.R. Fed. 946 (1983–present).

5

(citation omitted). A maritime lien may arise in contract or in tort, see, e.g., Chase Manhattan Fin. Servs., Inc. v. McMillian, 896 F.2d 452, 456 (10th Cir. 1990), and a plaintiff may bring a personal injury action in rem against a vessel "as in other cases where a maritime lien arises," The City of Panama, 101 U.S. 453, 462 (1880).

Rule C of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions provides for an in rem action to enforce a maritime lien. Fed. R. Civ. P. Supp. R. C(1)(a). Wherever a maritime lien arises, the plaintiff may proceed in rem in the admiralty to enforce it. Norton v. Switzer, 93 U.S. 355, 356 (1876). If the conditions for an in rem action appear to exist based on the complaint and supporting papers, the court must order the clerk to issue a warrant for the arrest of the vessel. Fed. R. Civ. P. Supp. R. C(1)(a)(i). This requires "a prima facie showing that the plaintiff has an action in rem against the defendant in the amount sued for and that the property [i.e., the vessel] is within the district." 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3222 (2d ed. 1982–present) (citation omitted); see also Fed. R. Civ. P. Supp. R. C(2). As one court put it:

> Whether the maritime lien arises by operation of law from a tort, from the supplying of goods, services and necessaries to a vessel, or from a preferred ship mortgage like those in the present controversy, the maritime lienor has an interest in the vessel herself, and the arrest of the vessel is to enforce that interest, the maritime lien. The action is to enforce a property right in the vessel.

Merchants Nat'l. Bank of Mobile v. Dredge Gen. G. L. Gillespie, 663 F.2d 1338, 1346 (5th Cir. 1981).

Any action in rem for seizure of a vessel must be premised on the existence of a valid maritime lien at the time the action was filed. Crimson Yachts, 603 F.3d at 868 (citations omitted). A "preferred maritime lien" means a maritime lien on a vessel for damages arising out of a maritime tort. 46 U.S.C. § 31301(5)(B)(5). A maritime tort, in turn, is a tort over which federal courts may exercise admiralty jurisdiction, encompassing every species of tort committed

6

on the high seas or other navigable water, including wrongs suffered because of the negligence of others. Robert Force & Martin J. Norris, The Law of Maritime Personal Injuries § 1:1 (5th ed. 2008–2014). Thus, to secure the seizure of a vessel through an in rem proceeding, the plaintiff must allege a maritime tort that forms the basis of a maritime lien.

Enforcement of a maritime lien, however, can be maintained only within the district court's admiralty jurisdiction. E.S. Binnings, Inc. v. M/V Saudi Riyadh, 815 F.2d 660, 662 (11th Cir. 1987), abrogated on other grounds by Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603 (1991). Indeed, "whether maritime jurisdiction exists is a question anterior to, although often coincident with, the question of whether the plaintiff has a maritime lien." Wilkins v. Commercial Inv. Trust Corp., 153 F.3d 1273, 1276 (11th Cir. 1998). Because enforcement of a maritime lien is the exclusive jurisdiction of federal courts sitting in admiralty, and a maritime lien must be predicated on a maritime tort, admiralty jurisdiction is a precondition for the existence of a maritime tort and, necessarily, a maritime lien. See E.S. Binnings, Inc., 815 F.2d at 667.

It follows that Craddock's emergency motions present three issues. First, and most importantly, the Court must determine whether it has admiralty jurisdiction over Craddock's negligence claim. "Only an admiralty court acting in rem can foreclose a maritime lien . . . ." Chase Manhattan Fin. Servs., Inc., 896 F.2d at 456–57. Second, the Court must decide whether the alleged negligent operation of THE GOLDEN RULE constitutes a maritime tort that gives rise to a maritime lien, creating the conditions for the in rem seizure of the vessel. Lastly, the Court must adjudicate whether seizure of THE GOLDEN RULE is appropriate in this case. Each issue will be addressed in turn.

### B. Admiralty Jurisdiction

The Court's analysis begins with admiralty jurisdiction.

A federal court's authority to hear cases in admiralty flows initially from the Constitution, which extends federal judicial power to any civil case of admiralty jurisdiction. Alderman v. Pac. N. Victor, Inc., 95 F.3d 1061, 1063 (11th Cir. 1996) (citation omitted). Traditionally, the test for admiralty tort jurisdiction was simple: jurisdiction existed if the tort occurred on navigable water. Id. at 1063. As technology advanced, however, it became apparent that this test was no longer sufficient. Id. So, in a trilogy of cases, the United States Supreme Court redefined the test for admiralty cases. Id. (citing Exec. Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972); Foremost Ins. Co. v. Richardson, 457 U.S. 668 (1982); Sisson v. Ruby, 497 U.S. 358 (1990)).

Today, for a tort claim to be cognizable in admiralty, the activity from which the claim arises must not only satisfy a location test, but it must also have sufficient connection to traditional maritime activity. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995); id. at 1064 (citation omitted ). "A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." Grubart, 513 U.S. at 534; Alderman, 95 F.3d at 1064. The connection or nexus test, moreover, raises two issues. First, the court must "assess the general features of the type of accident involved[] to determine whether the incident has a potentially disruptive impact on maritime commerce." Alderman, 95 F.3d at 1064 (quoting Grubart, 513 U.S. at 534) (internal quotations omitted). Second, the court must "determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Id. (quoting Grubart, 513 U.S. at 534) (internal quotations omitted). Distilled to its elements, admiralty jurisdiction extends to torts where (1)

8

the injury occurs or takes effect on navigable waters, (2) the "general character" of the activity giving rise to the tortious incident "shows a significant relationship to traditional maritime activity," and (3) the incident has a "potentially disruptive impact on maritime commerce." See Grubart, 513 U.S. at 532–34 (citations omitted).  All three elements must be met to create admiralty jurisdiction over a tort claim.

### 1. The Locality Test

The Court first considers whether the accident involving THE GOLDEN RULE and Craddock satisfies the locality test.  "Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." Mink v. Genmar Indus., Inc., 29 F.3d 1543, 1545–46 (11th Cir. 1994) (quoting The Plymouth, 70 U.S. 20, 36 (1866)).  Accordingly, to satisfy this test, a tort need only occur on navigable water—which clearly occurred in this case. The Court thus finds the locality test satisfied.

### 2. The Nexus Test

The Court next determines whether the accident bears a significant relationship to traditional maritime activity.  As noted above, the nexus test presents two issues.  As to the first question, a court must look to "whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping." Alderman, 95 F.3d at 1064 (quoting Grubart, 513 U.S. at 539).  The correct inquiry is not whether there was an effect on maritime activity, but rather whether there "potentially" could have been.  Id. (citing Grubart, 513 U.S. at 539).  In other words, when examining the disruptive impact on maritime activity for purposes of determining jurisdiction, the focus is not on what actually happened, but on the potential effects of what could happen.  Id.  This first question turns on a description of the incident at an "intermediate level of possible generality."  Id.

9

The Court finds that the incident at issue here had a potentially disruptive impact on maritime commerce. Described at an intermediate level of possible generality, the accident between THE GOLDEN RULE and Craddock may be articulated as a pleasure boat colliding with a recreational swimmer in navigable water. Such an accident might require emergency measures, such as a rescue effort, or an investigation of some sort, which could restrain commercial traffic through the area. This type of accident poses "more than a fanciful risk to commercial shipping."[5]

The Eleventh Circuit has found potential disruption to maritime commerce under seemingly more attenuated circumstances. For instance, in Mink v. Genmar Indus., Inc., 29 F.3d 1543 (11th Cir. 1994), a passenger aboard a pleasure craft sued the vessel's manufacturer for injuries he sustained after being slammed onto the deck as the boat was being operated at high speed on navigable water. Id. at 1544. In finding admiralty jurisdiction over the case, the Eleventh Circuit held that the incident posed a potential hazard to maritime commerce because,

> although there was no actual disruption of maritime commerce . . ., there clearly was a potential disruption. [Plaintiff] could have fallen forward, striking the pilot or controls, thus directly interfering with the navigation of the craft and potentially causing an accident with another craft. Or, the disruption of a serious passenger injury within such intimate confines could have distracted the pilot and indirectly interfered with the navigation of a vessel.

Id. at 1546. If the chain of events in Mink were found to be potentially disruptive, then this Court is compelled to conclude that the accident at issue here, which could have obstructed the flow of commercial traffic pending an emergency rescue of the victim or an investigation into the incident, had a potentially disruptive impact on maritime commerce.

---

[5] That THE GOLDEN RULE is a pleasure boat rather than a vessel engaged in commercial shipping has no bearing on the jurisdictional result. See, e.g., Neely v. Club Med Mgmt. Servs., Inc., 63 F.3d 166, 179 (3d Cir. 1995).

As to the second question, the inquiry is "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the case at hand." Grubart, 513 U.S. at 539–40. Here, the relevant activity is the allegedly negligent operation of THE GOLDEN RULE on navigable water, which the Supreme Court has held "has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction." Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674 (1982).

Therefore, because the incident involving THE GOLDEN RULE and Craddock posed more than a fanciful risk to maritime commerce, and the negligent operation of a vessel on navigable water bears a significant relationship to traditional maritime activity, the Court finds the nexus test satisfied in this case.

3. This Action Is Subject to Admiralty Jurisdiction

The Court concludes that this case falls within its admiralty jurisdiction. Not only does it satisfy the locality test insofar as the accident occurred on navigable water, but it also satisfies the nexus test insofar as the accident posed a potentially disruptive impact on maritime commerce and bore a substantial relationship to traditional maritime activity. This determination is consistent with the rulings of other courts in similar cases. See, e.g., Medina v. Perez, 733 F.2d 170 (1st Cir. 1984) (finding admiralty jurisdiction over an action for damages sustained by two swimmers who were struck and injured by a small pleasure boat, since the wrong alleged was the negligent operation of the vessel); Davis v. City of Jacksonville Beach, Fla., 251 F. Supp. 327 (M.D. Fla. 1965) (finding admiralty jurisdiction over an action growing out of an accident occurring in the ocean between a surfer and a swimmer).

C.     **Maritime Lien**

Having established that this action is subject to federal admiralty jurisdiction, the next question is whether Craddock has a maritime lien on THE GOLDEN RULE to support the in rem seizure of the vessel. Before turning to this question, however, the Court must determine whether the alleged negligence constitutes a maritime tort, as a maritime lien exists only to the extent it is predicated on a maritime tort. The former cannot exist independently of the latter.

The Court finds that Craddock has alleged a maritime tort. As explained above, maritime torts are every species of tort committed on navigable water, including wrongs suffered as a result of the negligence of others. In this case, because Craddock alleges he was injured as a result of the negligent operation of THE GOLDEN RULE while snorkeling in the Atlantic Ocean, and this Court has admiralty jurisdiction over that claim, the alleged tortious conduct constitutes a maritime tort.

It follows that Craddock has a maritime lien on THE GOLDEN RULE. A maritime lien attaches and is perfected by operation of law when the claim arises. See, e.g., Merchants Nat'l. Bank of Mobile v. Dredge Gen. G. L. Gillespie, 663 F.2d 1338, 1346 (5th Cir. 1981). The lien attaches simultaneously with the cause of action and adheres to the maritime property until it is either executed through the in rem legal process available in admiralty or is somehow extinguished by operation of law. Thomas J. Schoenbaum, 1 Admiralty and Maritime Law § 9-1 (5th ed. 2011–2014); see also Riverway Co. v. Spivey Marine & Harbor Serv. Co., 598 F. Supp. 909, 912 (S.D. Ill. 1984) ("[T]he lien is a right of the injured party which arises at the moment of the breach or tort and attaches to the res.") (citations omitted). "The claim [itself] constitutes a lien." Nehring v. Steamship M/V Point Vail, 901 F. 2d 1044, 1047 n.4 (11th Cir. 1990). For these reasons, maritime liens are often characterized as "secret liens," as third parties may have

no notice of their existence. Itel Containers International Corp. v. Atlanttrafik Express Service, Ltd., 982 F.2d 765, 768 (2d Cir. 1992) (quotation omitted); see also Crimson Yachts v. Betty Lyn II Motor Yacht, 603 F.3d 864, 871 (11th Cir. 2010). Here, then, a maritime lien arose and attached to THE GOLDEN RULE the moment it ran Craddock over.

### D. Seizure of THE GOLDEN RULE

The final question this Court must resolve is whether seizure of THE GOLDEN RULE is appropriate in this case. Under Supplemental Admiralty Rule C, the court must order the clerk to issue a warrant for the arrest of the vessel if the conditions for an in rem action appear to exist based on the complaint and supporting papers. Fed. R. Civ. P. Supp. R. C(1)(a)(i). This requires a prima facie showing that the plaintiff has an action in rem against the defendant in the amount sued for and that the vessel is within the district. See Fed. R. Civ. P. Supp. R. C(2). Craddock has sustained this burden. The Verified Complaint In Rem alleges that Craddock has a maritime lien on THE GOLDEN RULE, which at last check was for sale within this judicial district. Accordingly, seizure of THE GOLDEN RULE is proper.

No judgment lien is thus required before Craddock can proceed with the in rem seizure of THE GOLDEN RULE. "The creation of a maritime lien requires no judicial action." Riverway Co. v. Spivey Marine & Harbor Serv. Co., 598 F. Supp. 909, 912 (S.D. Ill. 1984). As one court explained, "Processes in rem and of maritime attachment represent an exception to the general rule that in the absence of statutory authorization a plaintiff may not have security for his claim until it is established and reduced to judgment." Thyssen Steel Corp. v. Fed. Commerce & Nav. Co., 274 F. Supp. 18, 21 (S.D.N.Y. 1967). The Court departs from its prior ruling to the extent it held otherwise.

**IV.   CONCLUSION**

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED as follows:

1. Plaintiff Marc Craddock's Motion for Reconsideration (ECF No. 10) is GRANTED.

2. The Court's November 4, 2014, Order (ECF No. 6) is VACATED.

3. The Clerk of the Court is directed to issue a warrant of arrest for THE GOLDEN RULE, provided the vessel is within the district.

4. Fastboat Marine Group is appointed as substitute custodian of THE GOLDEN RULE and is authorized to move the vessel from its current location in this district to its secured facility located at 1490 N. Federal Highway, Pompano Beach, Florida, provided the vessel is within the district.

5. Plaintiff's Unopposed Motion to Continue the Trial Setting of this Cause is DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of May, 2015.

K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

cc:   All counsel of record